**E-FILED**
Wednesday, 03 November, 2004  10:09:25 AM
Clerk, U.S. District Court, ILCD

**RECEIVED**

MAY 1 1 2004

U.S. CLERK'S OFFICE
PEORIA, ILLINOIS

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

**FILED**

OCT - 1 2004

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

|  |  |
|---|---|
| TAS DISTRIBUTING COMPANY, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 03-1026 |
| | ) |
| CUMMINS ENGINE COMPANY, INC., | ) |
| | ) |
| Defendant. | ) |

### TAS DISTRIBUTING COMPANY, INC.'S RESPONSE IN OPPOSITION TO CUMMINS INC.'S MOTION FOR SUMMARY JUDGMENT

NOW COMES Plaintiff, TAS Distributing Company, Inc., ("TAS") by and through its

attorneys, Elias, Meginnes, Riffle & Seghetti, P.C., and as and for its Response in Opposition to

the Motion for Summary Judgment filed by Cummins, Inc. ("Cummins"), pursuant to Rule 56 of

the Federal Rules of Civil Procedure and Rule 7.1 of the Local Rules for the Central District of

Illinois, states as follows:

### I.    INTRODUCTION

Cummins approached TAS with bold promises regarding its desire to license, and ability

to successfully sell, the TAS Technology.  Cummins wanted the TAS Technology in order to

successfully compete with Detroit Diesel Corporation (DDC) (Cummins's direct competitor

which already had a license for the sale of products containing the TAS Technology).  Cummins

represented that its sales of products utilizing the TAS Technology would be competitive with

DDC, projecting an annual sales volume of 10,000 units (eventually ramping up to 12,000).

TAS entered into a License Agreement with Cummins containing the following provision:

> Licensee shall make <u>all reasonable efforts</u> to market and sell ECM
> Products and Retrofit Products so as to maximize the payment of

> royalties to Licensor under this License Agreement. (Emphasis added).

License Agreement (defined below), Section 6(f). Based upon Cummins's representations, TAS subsequently agreed to forego more favorable terms which it could have negotiated with DDC (since TAS had obtained a Court Order negating DDC's rights in the TAS Technology).

Through the first five years of the License Agreement, as amended, Cummins averaged sales of less than 200 units per year (less than 2% of what Cummins had represented that it would sell), while over that same period of time, DDC was successful in selling an average of over 15,000 units per year (Exhibit A (defined below), ¶24), meaning that Cummins was successful in selling only 1.33% of the volume of Products that DDC sold.

As discussed in detail below, there is substantial evidence that Cummins failed to "make all reasonable efforts to market and sell ... Products" utilizing the TAS Technology, in breach of its obligations under the License Agreement. Cummins's efforts (as well as its results) were abysmal. For example, there were substantial periods of time when Cummins marketed no product utilizing the TAS Technology for most, if not all, of its major engine lines. There were substantial periods when Cummins sold no products utilizing the TAS Technology. There were substantial periods of time when Cummins had no marketable product utilizing the TAS Technology. There were times when internal memoranda indicate that the Cummins's branded product utilizing the TAS Technology was "all but dead," and no marketing or development efforts were undertaken. The development and marketing of the TAS Technology was hampered by internal disputes between departments or divisions within Cummins, primarily regarding which department's budget would be responsible, and which department would be required to devote its resources to the cause. There were numerous activities which Cummins could have undertaken in order to sell more Products utilizing the TAS Technology, but that Cummins failed

2

to do. By way of example, Cummins failed to develop and market a separate Temp-A-Stop product, failed to market to the "engine ready" or bus markets, failed to advertise the products containing the TAS Technology in trade journals, failed to develop a formal marketing plan, and failed to feature the product at trade shows (other than the year of the initial launch). The deposition testimony of Cummins's employees (quoted and discussed in detail below) shows just how completely Cummins dropped the ball, thereby failing to meet its obligations under the "all reasonable efforts" clause in the License Agreement.

The bottom line is that, having convinced TAS of its interest in and commitment to the TAS Technology, Cummins, a major New York Stock Exchange listed company with a market capitalization of $2.5 billion, and annual engine sales of between 37,000 and 90,000 units, claims to have been unable to sell more than 200 units of the proprietary technology in a year. Cummins apparently contends that it allegedly exhausted all reasonable efforts to market and sell the Products containing the TAS Technology. This allegation is beyond belief, and is not consistent with the evidence adduced in discovery. As discussed in detail below, Cummins's failures clearly breached the "all reasonable efforts" clause in the License Agreement.

Cummins seeks to avoid its responsibilities to TAS by means of its Motion for Summary Judgment which claims, in part, that the "all reasonable efforts" clause is unenforceable because it involved the sale of a "new product," and that the damages claims raised by TAS are "fanciful." As demonstrated below, the products in question are far from new, but rather were well-established products at the time the License Agreement was executed, and the damages claims asserted by TAS are far from "fanciful", but rather are real and reasonably ascertainable.

Finally, in its Motion for Summary Judgment, Cummins appears to misunderstand the temporal interplay between TAS's requests for damages for breach of contract, and TAS's

3

requests for an order for specific performance of the License Agreement. Counts I, III, V and VII of the Complaint seek damages incurred by reason of Cummins's past breach of the "all reasonable efforts" clause in the License Agreement. The purpose of Counts I, III, V and VII of the Complaint is to make TAS whole as of the date of judgment. In contrast, Counts IX through XII of the Complaint seek an Order compelling Cummins specifically to perform its obligations under the License Agreement on a going-forward basis. The purpose of Counts IX through XII of the Complaint is to secure for TAS the benefit of its bargain in the future.

## II. RESPONSE TO CUMMINS'S STATEMENT OF ALLEGEDLY UNDISPUTED MATERIAL FACTS

### (1) Undisputed Facts

The following allegations of fact are undisputed, excecpt insofar as Cummins has characterized or partially quoted from a provision of a document or transcript, in which case the documents or transcripts speak for themselves as to their terms and contents: Numbers 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 20, 26, 37, 38.

### (2) Disputed Allegations

The following allegations of fact are disputed, or require clarification:

Number 16. Cummins correctly quotes section 6(b) of the original License Agreement, and correctly points out that this provision was deleted in its entirety. However, Cummins incorrectly claims that Section 6(b) was the provision that dealt with payment of royalties in subsequent years. That provision is Section 5. The fact that Section 6(b) was deleted does not impact the obligation, pursuant to Section 5, to pay per unit royalties.

Number 19. Cummins correctly alleges that it paid $1,000,000 in minimum royalties. TAS denies, however, that this was the amount required to be paid under the License Agreement,

4

as Cummins breached its obligations under the "all reasonable efforts" clause in Section 6(f) of the License Agreement.

Number 21.    The "all reasonable efforts" clause required Cummins to include, or at least make available, the Temp-A-Stop product on all electronic engines sold by Cummins, as the competing product sold by Cummins (idle shutdown) was sold on all such engines, and the inclusion of the Temp-A-Stop technology could have been accomplished at minimal cost. *(See* Slepian Affidavit in Support of Motion for Partial Summary Judgment, ¶44).

Number 22.    Cummins eventually developed a Two Box Product, which apparently is still available. Cummins apparently developed a One Box Product, which was available only for a brief period of time, and is no longer available.

Number 23.    Only the "Two Box Product" was "launched" in 1999.

Number 24.    TAS disputes Cummins's contention that Cummins was "forced" to discontinue its One Box Product to meet EPA regulations. Cummins failed to have the foresight to take steps to develop its new electronic control module (ECM) with enough "ports" to accommodate the ICON Product. Its competitor, DDC, had that foresight, and continues to offer a "One Box" Product. DDC was able to include the TAS Technology when it updated its ECM to comply with the IEPA emissions regulations.

Number 25.    Cummins has characterized the Complaint filed by TAS, and has failed to include all of the assertions and claims. The Complaint speaks for itself.

Numbers 27-36.    Cummins has characterized the testimony of Harvey Slepian. That testimony speaks for itself, and must be viewed in appropriate context.

**(3)    Immaterial Allegations**

5

TAS does not specifically contend that the statements set forth by Cummins are immaterial.

**(4)    Additional Material Facts**

### Overview of Salient Facts

1.    TAS is primarily engaged in the business of inventing, developing, engineering, marketing, and licensing patented, proprietary and innovative technology which is primarily used to automatically start and stop engines (the TAS Technology). Some of the benefits of the TAS Technology include substantial fuel savings, increased engine life, and benefits to the environment. (Affidavit of Harvey Slepian in Opposition to Motion for Summary Judgment filed by Cummins, Inc. ("Slepian Affidavit"), attached hereto as Exhibit A, ¶2).

2.    In the early 1990's, it became apparent in the truck engine industry that the TAS Technology was extremely valuable, patented technology which would be useful and marketable, and which would enhance the sale of truck engines by a manufacturer of truck engines which had that proprietary technology. (Exhibit A, ¶3).

3.    In approximately 1996, Cummins approached TAS, and indicated to TAS that it was losing market share in the truck engine market to DDC, its direct competitor, because DDC had the TAS Technology (pursuant to a prior license between TAS and DDC), and Cummins did not. (Jones Deposition Testimony[1], pgs. 20-21; Exhibit A, ¶4).

4.    Cummins urged TAS to aggressively pursue litigation against DDC to obtain a declaration either that DDC's rights under TAS's License Agreement with DDC had been validly terminated altogether, or that DDC no longer had exclusive rights to the TAS

---

[1] The transcript of the deposition of Jeffrey D. Jones (the Jones Deposition Transcript) was attached to TAS's Motion for Partial Summary Judgment, filed in the Court on April 19, 2004, as Exhibit G. In the interest of saving space in the Court's files, no additional copy of the Jones Deposition Transcript is

6

Technology. TAS proceeded to do so, in a case in this Court, Case No. 96 C 1516 (the TAS/DDC Lawsuit). (Exhibit A, ¶5).

5.     Cummins represented to TAS that it had a very strong desire to obtain rights to use the TAS Technology, that it would make the development and use of the TAS Technology a very high priority, and that it would devote substantial and sufficient resources to the development and adoption of the TAS Technology if it were granted rights to the TAS Technology. In reliance upon those representations, and at the strong urging of Cummins, TAS began to negotiate contingent agreements with Cummins with respect to the TAS Technology. (Exhibit A, ¶6).

6.     Representatives of Cummins, including Matt Horgan, represented to Mr. Slepian that Cummins could sell 10,000 or more products containing TAS Technology on an annual basis. (Exhibit A, ¶7).

7.     Mr. Horgan confirmed his statements to Mr. Slepian by letter dated April 16, 1996. (*See* Exhibit 78, attached hereto; Exhibit A, ¶8).

8.     Cummins's representatives (including Jeff Jones and Matt Horgan) further represented to TAS that Cummins's market share (in the heavy duty over the road truck engine market) was approximately equivalent to that of DDC, a direct competitor of Cummins. (Exhibit A, ¶9).

9.     Cummins's representatives indicated to Mr. Slepian that Cummins was in the process of substantially improving its engine electronics, and that it expected to increase its market share over the course of the next few years. (Exhibit A, ¶10).

---

attached hereto, and all references to the Jones Deposition Transcript refer to Exhibit G of TAS's Motion for Partial Summary Judgment.

10.     Cummins indicated to Mr. Slepian that it would be able to sell at least as many products utilizing TAS Technology as its competitor, DDC. (Exhibit A, ¶11).

11.     Cummins further represented to TAS that it expected to ramp up its sales to 12,000 units per year. (Exhibit A, ¶12).

12.     By Order entered in the TAS/DDC Lawsuit on or about March 31, 1998, this Court granted summary judgment in TAS's favor, declaring that DDC's rights under the License TAS/DDC Agreement were validly terminated. (Exhibit A, ¶13).

13.     DDC moved for reconsideration of the Summary Judgment Order. (Exhibit A, ¶14).

14.     DDC indicated that it intended to appeal or otherwise seeks relief from the summary judgment ruling. (Exhibit A, ¶15).

15.     At the urging of Cummins, TAS entered into settlement negotiations with DDC with respect to the TAS/DDC Lawsuit, to avoid the possibility of an appeal, and to expedite Cummins's access to and right to use the TAS Technology. (Exhibit A, ¶16).

16.     Cummins induced TAS to forego substantial monetary compensation from DDC in the course of the settlement negotiations, and instead to negotiate for the rights of Cummins to quickly have a "co-exclusive" right to certain of the TAS Technology, to the exclusion of other engine, truck and tractor manufacturers (except Mack, Inc.). (Exhibit A, ¶17).

17.     DDC would have paid substantial compensation to TAS to regain its exclusive right to the TAS Technology. (Exhibit A, ¶18).

18.     Because of Cummins's representations as to its strong commitment to the TAS Technology (which were made at the time the TAS/Cummins License Agreement was negotiated and executed, and repeated throughout the course at the TAS/DDC Lawsuit), TAS decided to

8

negotiate with DDC in a manner which would allow Cummins to immediately have "co-exclusive" rights to the TAS Technology (instead of waiting for a final decision in the TAS/DDC Lawsuit). TAS did so, however, under the previously negotiated express agreement set forth in Section 6(f) of the License Agreement, that Cummins would "make all reasonable efforts to market and sell ECM Products and Retrofit Products so as to maximize the payment of royalties to Licensor under this License Agreement," and that it would do so on an expedited basis. (Exhibit A, ¶19).

19.     Upon granting Cummins "co-exclusive" rights to the TAS Technology with DDC and Mack, TAS reasonably believed that Cummins would honor its contractual obligation to fully and promptly utilize the TAS Technology so as to maximize royalties to TAS. (Exhibit A, ¶20).

20.     TAS reasonably believed that the TAS Technology would be fully utilized by DDC in its approximately 30% of the U.S. Truck Engine Market, and by Cummins in its approximately 20% to 30% of the U.S. Truck Engine Market. Cummins represented to TAS that it believed that it could sell 4000 Products in the first year, and 10,000 Products in each year thereafter. (Exhibit A, ¶21).

21.     But for Cummins's representations and warranties as to its firm commitment to fully and aggressively utilize the TAS Technology, so as to maximize royalties payable to TAS, TAS would not have entered into the Licensing Agreement with Cummins, and would not have settled with DDC (and therefore would not have been able to immediately grant Cummins co-exclusive rights in the TAS Technology), but rather would have pursued its substantial monetary claims against DDC. (Exhibit A, ¶22).

9

22.    At the time TAS entered into negotiations to license the TAS Technology to Cummins, TAS and its predecessors and affiliates had been manufacturing and selling TAS Technology for over ten years, and DDC had been manufacturing and selling products containing the TAS Technology for more than 2 years. (Exhibit A, ¶23).

23.    DDC has sold an annual average of approximately 15,000 Products containing the Temp-A-Start Technology over the period of 1998-2002. (Exhibit A, ¶24).

24.    Cummins's "Icon" product was similar in all respects and functions to the products containing the Temp-A-Start technology produced by TAS and DDC. (Exhibit A, ¶25)

25.    Mr. Slepian's deposition was taken prior to the depositions of Cummins's employees.    At the time of his deposition, Mr. Slepian had a general understanding of Cummins's failures to devote significant resources and effort to the development and marketing of Cummins's branded products containing the TAS Technology.    These failures included the following, as attested to in TAS's Answers to Interrogatories:

> TAS was aware of disputes or disagreements within Cummins regarding which department would be responsible from a budget standpoint for development of products utilizing the TAS Technology, and believes that these disputes interfered with development efforts.    Moreover, Cummins repeatedly changed personnel who were working on the development of Products utilizing TAS Technology, and the personnel who were assigned were given insufficient resources and direction to bring the product to market on a significant commercial scale.  For example, in July of 2001, Cummins re-assigned responsibility for marketing the ICON product (employing the TAS Technology) to a new individual (Alissa Kanwit) who phoned Harvey Slepian (President of TAS), and informed him that she was a part-time employee who had very limited understanding of the product, the technology, and its potential market. She asked Mr. Slepian for his suggestions and information regarding DDC's sales of similar products.    Ms. Kanwit was replaced by Sarah Kantz in that position in October of 2001.    No marketing plan was in place when Ms. Kanwit commenced her responsibilities, and no marketing plan was in place when she left that role.  TAS understands and believes that

> the personnel assignments for engineering and development were also frequently changed, and that development of Products utilizing the TAS Technology was given a very low priority within Cummins. At the present time, more than six (6) years after the initial agreement with TAS, despite the fact that it clearly has the resources to do so, Cummins has no commercially viable Products utilizing the TAS Technology.

(Exhibit A, ¶ 26).

26. During the depositions of the Cummins's employees, Mr. Slepian learned of significant specific failings of Cummins in the development and marketing of the TAS Technology, examples of which are highlighted in the quoted testimony of Cummins's employees, below. (Exhibit A, ¶27).

27. Cummins has reported sales to TAS of an approximate annual average of only 200 Products utilizing the TAS Technology for each of the first four (4) years of the License Agreement. (Exhibit A, ¶28).

Cummins's Pre-Contract Views Regarding the Importance of the TAS Technology

28. Jeff Jones, Vice President of Sales of Cummins, wrote a Memorandum dated May 26, 1995, to senior management of Cummins, stating, in pertinent part, as follows:

> 2. Detroit "optimized idle" capabilities. This is also huge, since it will offer the potential to reduce fuel costs and is measurable. We know from the recent DDC releases that the DDECIII system will allow customers to program idle shutdown to match ambient temperature ranges. In addition, Detroit has apparently partnered with "Tempstart" Company to provide an engine starting system that is a function of temperatures in the sleeper. It appears that Detroit is making a quantum leap in its idle management capabilities, and I believe this will deliver many fleet customers a measurable comparative advantage. This will become a "basic" feature that will shut us out of many fleets. Customers have been asking us for this feature for several years, and we were told over a year ago that it wouldn't fit in ECMC.

(Exhibit 82, attached hereto).

Cummins's Projections of Sales of TAS Technology and Representations to TAS

29. In a meeting in the lunchroom at Cummins's facility in Columbus, Indiana, prior to execution of the original agreement between the parties, Matt Horgan, a Cummins employee, made the following statements to Harvey Slepian, President of TAS:

"We will have no problem selling at least as many [products] as DDC."

"We will do 10,000. That's probably low, but at least 10,000."

(Exhibit A, ¶7).

30. Mr. Horgan confirmed his statements to Mr. Slepian in a letter, dated April 16, 2996 (Exhibit 78, attached hereto).

31. Mr. Horgan further stated to Mr. Slepian, (in response to a question from Mr. Slepian) that he believed that the "product life" would be "at least ten (10) to fifteen (15) years." (Exhibit A, ¶7).

32. Cummins prepared a Powerpoint presentation showing the gross disparity between its projections at the start of its relationship with TAS, and the actual, dismal sales of Products utilizing the TAS Technology. (Exhibit 17, attached hereto).

Delays in Bringing Products to Market

33. Cummins promised to TAS that it would "exercise all reasonable efforts to begin production of the Retrofit Product by July, 1997. (Intellectual Property License Agreement, dated February 22, 1997 (the License Agreement), attached hereto as Exhibit B, ¶6(d)).

34. Cummins failed to meet its contractual obligations to bring the Retrofit Product to market by July, 1997, and, in fact, did not do so until 1999. (Exhibit A, ¶29).

35. Cummins failed to bring the ECM Product to market until 2001. (*See* Exhibit 101, attached hereto).

12

Failures to Continue to Keep Products Available

36.    The ECM Product was only available for a several month period (from some point in 2001 to some point in 2002).  (Exhibit A, ¶30).

37.    Cummins has no current plans to re-introduce an ECM Product.  (Exhibit A, ¶31).

38.    The Retrofit Product is not available for all engine lines.    (Exhibit A, ¶32).

39.    Sales of products containing the TAS Technology in 2001 were negligible.  By that time, Cummins had clearly abandoned any meaningful effort to market the product.  In January and February of 2001, absolutely no Products were sold.  In March, 2001, Cummins "ramped up" to a grand total of 2 retrofit product sales (and still no ECM sales).  (Exhibit A, ¶40; Exhibit 99, attached hereto).

Cummins's Lack of Communication with TAS

40.    Cummins sent a letter dated December 7, 1998, to TAS updating the progress of development and marketing efforts.  (*See* Exhibit 94, attached hereto).  To the best of TAS's knowledge, that letter was the only substantive communication to TAS regarding development and/or marketing efforts.  (Exhibit A, ¶33).  Also to the best of TAS's knowledge, that 1998 letter (predating the initial product launch) provides an overview of the only marketing materials produced by Cummins regarding the TAS Technology.  (Id.)

41.    Cummins made significant decisions which greatly diminished its opportunities to market and sell the TAS Technology (including efforts to suspend or cancel development of the Product) without notifying TAS.  (Exhibit A, ¶34).

Cummins's Failure to Feature the TAS Technology at Trade Shows Beyond 1999

42.    The only trade show at which the ICON Product was featured was the 1999 trade show, which was the year of the initial launch of the ICON Two Box Product.  (Exhibit A, ¶35).

<u>Cummins's Failure to Update Marketing Materials Beyond 2000</u>

43.      Cummins has not updated its marketing material regarding the ICON Product since 2000. (East Deposition Transcript[2], pg. 82).

<u>Failure to Include TAS Technology in New ECM</u>

44.      Cummins substantially changed and updated its Electronic Control Module (ECM) for its major engine lines in 2002 from the CM570 to the CM870. (Putterill Deposition Transcript[3], at pg. 129).

45.      Cummins failed to include the TAS Technology in its new ECM. (Putterill Deposition Transcript, at pg. 129).

46.      While Cummins initially claimed that it was not technologically feasible to include the TAS Technology in its new ECM, it was acknowledged that it was technologically feasible for a "One Box" Product to be manufactured for the ISX02 Engine. (Putterill Deposition Transcript, pg. 131).

47.      Once it was decided that the TAS Technology would not be made operational in the CM870 ECM, Cummins considered use of a secondary control module (the EM100) in which the TAS Technology could reside. (Putterill Deposition Transcript, pg. 131).

48.      While there were some advocates within Cummins regarding the EM100 concept, the EM100 idea was never implemented. (Exhibit A, ¶36).

---

[2] The transcript of the deposition of Roe East (the East Deposition Transcript) was attached to TAS's Motion for Partial Summary Judgment, filed in the Court on April 19, 2004, as Exhibit F. In the interest of saving space in the Court's files, no additional copy of the East Deposition Transcript is attached hereto, and all references to the East Deposition Transcript refer to Exhibit F of TAS's Motion for Partial Summary Judgment.

[3] The transcript of the deposition of Cliff Putterill (the Putterill Deposition Transcript) was attached to TAS's Motion for Partial Summary Judgment, filed in the Court on April 19, 2004, as Exhibit E. In the interest of saving space in the Court's files, no additional copy of the Putterill Deposition Transcript is

14

49.     Efforts to keep the ICON Product in the new ECM were "suspended" or "cancelled". (Putterill Deposition Transcript, pg. 138).

50.     The decision not to integrate the ICON Product in the new engine ECM was not communicated to TAS. (Putterill Deposition Transcript, pg. 138).

51.     There is currently no plan to have a "One Box" or ECM version of the ICON Product. (Jones Deposition Transcript, pg. 72).

Key Testimony of Jeff Jones

52.     Regarding Cummins's current performance under the License Agreement, Jeffrey Jones, Vice President of Field Sales and Support and Marketing Support, testified as follows:

> Q [by Mr. Riffle] Are you aware of any current plans with respect to the ICON product in terms of development of additional products?
>
> A  No.

(Jones Deposition Transcript, pg. 72 lines 13 through 15).

53.     Mr. Jones further testified as follows regarding marketing for the ICON Product:

> Q [by Mr. Riffle]  What are the current marketing efforts with respect to the ICON products?
>
> A  The -- it's available as an option at International Truck Company in some of their chassis. I'm not sure -- I don't know which models, but it's available on a number of their models, and it's available as an option at Volvo on our eng -- on our engine in a couple of their models. So --
>
>         *      *      *
>
> A  The -- so the OEM can provide it as an option. I'm not quite sure whether it's published in their data book -- what's referred to their data book as an option, but it's available upon request as an option. And our -- and Cummins produces some sales literature,

---

attached hereto, and all references to the Putterill Deposition Transcript refer to Exhibit E of TAS's Motion for Partial Summary Judgment.

and it's mentioned as an available option on the Cummins ISX
engine in, I believe, some of our engine literature.
So that's -- I'd say that summarizes it.

Q  Has Cummins put out any new sales literature with respect to
the ICON product in the last three years?

A  I don't really know.

(Jones Deposition Transcript, pg. 72 line 16 through pg. 73 line 15).

Q [by Mr. Riffle]  Has Cummins advertised the product in any
trade magazines in the last three years?

A  Again, I don't know.

(Jones Deposition Transcript, pg. 73 lines 16 through 18).

Q [by Mr. Riffle]  ....  Was there any literature available with
respect to the ICON product at the 2004 mid-America Truck
Show?

A  I don't know.  I didn't really -- I didn't pay attention to what
literature we had there.

(Jones Deposition Transcript, pg. 74 lines 18 through 21).

Q [by Mr. Riffle]  Let me ask it this way:  Do you know of any
marketing effort made at the dealer or distributor level with respect
[to] the ICON product?

A  I'm not aware.

(Jones Deposition Transcript, pg. 132, lines 6 through 9).

54.    Mr. Jones testified as follows in regard to historical efforts marketing the ICON

Product:

Q [by Mr. Riffle]  Okay.  Moving on into, say, the 2000 time
frame, what marketing efforts are you aware of with respect to
ICON in 2000.

A  We continued, you know, of course our sales literature and our
presentation materials and our -- what I would consider the normal
sales tools included the ICON message.

Like any other -- what I would call value added option. So you
know, it continued on. The -- so I'd -- I'd say it continued on, on a
sort of normal basis during that time period.
We were past the initial launch of the product where awareness
building was behind us, and then we went on more of a -- sort of a
-- from a maintenance standpoint, I guess you'd call it, continued to
market it, but not the initial launch activities.

Q  Were there any new or different marketing efforts in 2000?

A  The availability on the X was new, so we promoted it as an
available option on the ISX engine.  And the ISX engine was a big
deal as we launched it.

Q  When you say you "promoted its availability," can you describe
in detail how that -- how ICON was promoted with respect to the
ISX engine?

A  It was mentioned as one of the available options with the base
engine, and as I recall, most of our presentations, we -- there are
other options available with the X engine -- Centinel, ICON, in-a-
brake, different filter arrangements, things like that.
So it was one of the -- what I would call value added options that
was available on the engine.

Q  And how was that made known to the customers?

A  Through the -- it was made known to the customers through the
sales literature and sales tools that we provide to the market place,
and I would say the normal sales tools included ICON -- the ICON
message.

(Jones Deposition Transcript, pg. 114-15 (describes similar efforts in 2001)).

### Key Testimony of Roe East

55.     Roe East, Director of Market Strategy and pricing for the engine business at

Cummins, inherited responsibility for ICON in July of 2001.  (East Deposition Transcript, pg.

12).  At that time, he had a very limited understanding of the ICON Product.  (Id.)  He could not

recall who "briefed" him with respect to the Product.  (Id.)  From July, 2001 through the date of

17

his deposition, Mr. East spent less than 5 percent of his time on the ICON Product.  (Id. at pgs.

19-20).

    56.    Mr. East testified as follows with respect to marketing efforts for the ICON

Product from July of 2001, through March, 2004:

> Q.  [by Mr. Riffle]  Can you give me a general overview of
> Cummins' marketing efforts from the time you inherited project
> responsibility through the present time?
>
> A.  Is there a specific aspect of the marketing that you would like
> to understand?
>
> Q.  I'm going to start with a general overview and then go to
> specific questions.
>
> A.  Okay.  So for my group it would have been making sure that
> we had the appropriate product literature, product training
> information available both to our internal sales force and to
> customers.  It would be making sure that the product was available
> to be purchased in our system.  And it would have been -- those, I
> guess, would have been the primary things in the time period that I
> was involved with the group.

(East Deposition Transcript, pg. 20, lines 2-17).

    57.    Mr. East further testified as follows:

> Q.  [by Mr. Riffle]  I may have interrupted you in terms of your
> overview of the marketing, and I started to ask specific questions.
>    I guess getting ourselves back to what you were testifying
> to, I had asked you to give me an overview of the various
> marketing functions while you were involved in the project.  Is
> there any other marketing function that we haven't talked about?
>
> A.  No.  Those are the primary marketing functions.
>
> Q.  Are there any specific tasks that were accomplished from a
> marketing standpoint during the time that you were involved with
> the product that we haven't talked about yet?
>
> A.  No.

(East Deposition Transcript, pg. 22, lines 7-21).

58.    In response to a question regarding Rule 30(b)(6) category, Mr. East testified as

follows:

> Q. [by Mr. Riffle]  Category five is Cummins marketing efforts
> with respect to the products.  And we've already touched upon
> that, particularly in connection with category two.   Is there
> anything else you can add with respect to Cummins' marketing
> efforts during the period of time that you had any involvement
> with the product?
>
> A. No, I think we've covered the marketing efforts.

(East Deposition Transcript, pg. 24 line 22 through pg. 25 line 4).

59.    Regarding the lack of additional sales efforts, Mr. East testified, in part, as

follows:

> Q. [by Mr. Riffle]  Are you suggesting that additional sales efforts
> to educate the customers wouldn't be effective to enhance the
> overall sales of idle management products?
>
> A. Sure, sure it would.  It would be effective but not –
>     I guess my perception and my belief is the product has been
> available in the marketplace for a number of years now.  Most
> fleets have seen it, heard about it, perhaps sampled it, and that
> they're definitely segments that – segments within those segment
> customers that prefer its use, and within other segments and even
> within that segment there are customers that don't use it.  And
> Caterpillar pretty much excluded from those segments that prefer it
> and those fleets that prefer it already.  So that was in terms of the
> way I answered your question.
>
> Q. So your assumptions was that any of the significant fleets that
> had an interest in this kind of idle management technology would
> have already migrated to either Cummins or Detroit Diesel to avail
> themselves of that product?
>
> A. I think the majority of them have is my personal belief, yes.
>
> Q. And has any market testing been done to determine whether or
> not that assumption is accurate?
>
> A. No.

19

(East Deposition Transcript, pg. 135 line 6 through pg. 136 line 8).

60.    Mr. East interpreted a reference in Cummins's internal documents to the ICON

Product being "all but dead" as follows:

> Q. [by Mr. Riffle]    There's a statement made "you may have
> noticed a flurry of activity on the ICON front – just when it was all
> but dead a major customer is threatening to not consider us if we
> do not have it – 1,000 ISX's are on the line."  Do you know what
> major customer that reference is to?
>
> A. No, I do not.
>
> Q. Where you still involved with the product in October of 2002?
>
> A. Yes, I was.
>
> Q. Do you know what the reference is to "all but dead"?
>
> A.  Yeah.  This document was written on October 22nd, 2002, so
> we had just released a product without integrated ICON.  And so I
> believe Cliff was saying, hey, we just released this product without
> it, but . . .which would mean it was all but dead, but we now have a
> 1,000 unit order and we need to find a way to satisfy that.

(East Deposition Transcript, pg. 165 line 9 through pg. 166 line 1).

61.    Mr. East explained the reference to "NIH" or "Not Invented here" on a Cummins

internal document relating to the TAS Technology, and the detrimental impact that "syndrome"

has on a product.

> Q. [by Mr. Riffle]   Over about two-thirds of the way down the
> page on the right there is initials NH or NIH.  Do you know what
> that means?
>
> A.  Not specifically.  It s a generic term for lots of people use to
> mean not invented here.
>
> Q.  Is there any reason why the fact there was not invented here
> would be a negative with respect to the ICON product?
>
> A.  I think products are always second nature in any organization
> that things happen quicker when there is a champion in place for

that. And when a product or technology is brought from the
outside that champion place needs to be there. In this case the
champion was Jeff Jones, and Jeff was a good champion for the
product. But it can be – a note invented here syndrome can be
detrimental to a product if there's not a champion in place like
there was with Jeff.

Q. Do you think it was detrimental in this particular case?

A. I think we had to explain to people sometimes what the value
of ICON was. And once they understood the value of ICON and it
meant to the customer, I think any – I think we overcome the idea
that this was a product that came from the outside.

(East Deposition Transcript, pg. 195 line 6 through pg. 196 line 5).

## Key Testimony of Clifford Putterill

62.     Clifford Putterill was Cummins's Marketing Department Project Manager for the

ICON Product from 2001-2003. (Putterill Deposition Transcript, pgs. 37-45).

63.     Mr. Putterill spent only "three to five percent" of his time on the ICON Product

for a six to eight month period during 2001. (Putterill Deposition Transcript, pg. 42).

64.     During that period, the ICON Product "wasn't a primary responsibility." Mr.

Putterill testified in this regard as follows:

> A. And I don't think I was ever taken off the project before, it just
> wasn't a primary responsibility at that time in 2001.
>
> Q. [by Mr. Riffle] I see. Let me back up and see if we can clarify
> the record because there may be some confusion there. I thought
> that were two distinct time frames when you were assigned to the
> product.
>
> A. Yeah. And I'm trying to think. The six months in 2001, apart
> from doing royalties there wasn't anything else that I was doing at
> that time. Yeah. I didn't hand it over to anybody else that I can at
> that time.

(Putterill Deposition Transcript, pg. 38 line 22 through pg. 39 line 8).

21

65.     By October 2002, Mr. Putterill (the Marketing Department Product Manager for ICON) thought that the ICON Product was "all but dead." (Putterill Deposition Transcript, pgs. 151-152).

66.     Only after a major customer came to Cummins and insisted that Cummins provide a product containing the TAS Technology as a pre-condition of ordering engines from Cummins did Cummins decide to focus additional resources upon the development and marketing of the ICON Product. (Putterill Deposition Transcript, pg. 151).

67.     Mr. Putterill sent an e-mail to a fellow employee at Cummins stating as follows:

> "You may have noticed a flurry of activity on the ICON front –
> just when it was all but dead a major customer is threatening to not
> consider us if we do not have it – 1,000 ISX's are on the line."

(Exhibit 105, attached hereto).

68.     In 2002, two major customers of Cummins (Volvo and International) were working on an "ICON harness," which would provide the wiring for the use of ICON on Volvo and International trucks, when Cummins cancelled the project which would have allowed for the installation of the TAS Technology in Cummins's new engine ECM. (Putterill Deposition Transcript, pg. 154).

### Disagreements between Divisions of Cummins Thwarted Cummins's Progress in Developing and Marketing the TAS Technology

69.     Internal Memoranda produced by Cummins contain the following references:

> "Service has not yet agreed to provide needed support."

(Exhibit 92, attached hereto (Bates stamped "005702")).

> "Minimal interest from Powercare."

(Exhibit 38, attached hereto (Bates stamped "013125")).

22

"As of yesterday, my management has re-prioritized my workload and directed me to discontinue support of the '02 ICON Marketing business case in favor of other higher priority work involving ISB02 electronics integration."

(Exhibit 41, attached hereto (Bates stamped "006796")).

70.     Jeff Jones testified that there were disagreements among the Cummins divisions concerning whose budget would be tapped to support research and development of Products utilizing the TAS Technology. (Jones Deposition Transcript, pg. 52).

### Failure to Meet Customers' Reasonable Requests and Requirements

71.     Because of the lack of leadership within Cummins in relationship to the TAS Technology, and the disagreements between Cummins's divisions, Cummins was unable to meet its customers' reasonable demands for products utilizing the TAS Technology. (*See* above, ¶¶69 and 70; *see* below, ¶¶72 through 76).

72.     Cummins apparently claims that it was not able to sell significant quantities of TAS Technology because of a lack of customer acceptance. (*See* Jones Deposition Testimony, pg. 82).

73.     A major customer of Cummins, Freightliner, requested that Cummins develop a LED display as a condition of utilizing the ICON Product. (Oakes Deposition Transcript[4], pgs. 191-195).

74.     The estimated cost of developing the LED display for Freightliner was $10,000. (Oakes Deposition Transcript, pg. 191).

---

[4] The transcript of the deposition of Jeffrey L. Oakes (the Oakes Deposition Transcript) was attached to TAS's Motion for Partial Summary Judgment, filed in the Court on April 19, 2004, as Exhibit H. In the interest of saving space in the Court's files, no additional copy of the Oakes Deposition Transcript is attached hereto, and all references to the Oakes Deposition Transcript refer to Exhibit H of TAS's Motion for Partial Summary Judgment.

23

75.     Cummins refused Freightliner's request for the development of the LED display as a condition of utilizing the ICON Product. (Oakes Deposition Transcript, pg. 192).

76.     Regarding the decision not to honor Freightliner's request, Mr. Oakes testified as follows:

> Q. [by Mr. Riffle]  Was there ever a written business case as to whether or not it made sense to go to the LED to satisfy Freightliner?
>
> A. Not a written.  I basically gave people my findings, what it would cost.  I was hoping that maybe we could split it between integrated and aftermarket, but at that time, marketing said no, don't worry about it.

(Oakes Deposition Transcript, pg. 192, lines 4 through 9).

### Development of Competing Technology by Cummins

77.     Without notifying TAS, Cummins began the development of a new technology involving a generator which is a product which directly competes with the TAS Technology. That generator product is called "Comfort Guard" and is being manufactured by Onan, a subsidiary of Cummins. (Exhibit 103, attached hereto).

78.     The marketing material relating to this new product, states, in pertinent part, as follows:

> Idle control devices that cycle your engine on and off used to be a good idea.  They reduced fuel costs associated with excess idling, and maintained your battery charge and oil temperature.
>
> But now there's a better solution, one that can save you money each and every time you pull off for a break.  The Cummins ComfortGuard™ system ....

(Exhibit 103).

24

79.    Jeff Jones testified as follows with respect to the comparison between the new

generator product (the "ComfortGuard" system) and the TAS Technology draw in Exhibit 103,

marketing materials regarding the ComfortGuard system:

> Q [by Mr. Riffle]  Have you ever seen the literature -- I'm handing
> you know what's been marked --
>
> THE REPORTER:  103.
>
> Q -- Exhibit 103.  Have you ever seen that document?
>
> A  I saw it two weeks ago.
>
> Q  What was your reaction when you saw that document?
>
> A  It looks like a good product.
>
> Q  The first paragraph says, "Idle control devices that cycle your
> engine on and off used to be a good idea."  Do you see that
> reference?
>
> A  Uh-huh.
>
> Q  Do you think that's an accurate statement?
>
> A  It depends on the audience.
>
> Q  Do you think it's no longer a good idea to have idle control
> devices?
>
> A  No.
>
> Q  You disagree with that statement?
>
> A  Depending on the customer, yeah.
>
> Q  At least for some customers you would disagree?
>
> A  Yeah, I'd disagree for some customers.
>
> Q  Do you think the -- at least as to some customers this
> advertising material could be detrimental to the sales of ICON?

MS. HOLZHALL:  Objection; calls for speculation.

MR. RIFFLE:  Can't think of anybody that would have a better view than Mr. Jones.

MS. HOLZHALL:  He's still speculating.

Q [by Mr. Riffle]  Do you have a view?

A  No, I don't have a view on that one.

Q  Do you think that Comfort Guard's a better solution than ICON?

A  It depends.

Q  Are you aware that -- do you know who manufactures the Comfort Guard product?

A  A -- I believe it's jointly manufactured by -- or it's manufactured primarily by the Cummins Power Generation business, and I -- so it's pri -- it's a Cummins product.

Q  Okay.  Is -- it references Onan here.  It says the genset is built by Onan.

A  Yeah.

Q  Is Onan owned by Cummins?

A  Yes.

Q  Okay.  How long has Cummins owned Onan?

A  17 -- 15, 16, 18 years.

(Jones Deposition Transcript, pg. 197 line 23 through pg. 199 line 16).

<u>Cummins's Failure to Develop, Market, or Sell a Separate Temp-A-Stop Product</u>

80.     As is discussed in detail in TAS's Motion for Partial Summary Judgment, filed in this Court on April 19, 2004, Cummins had an obligation to develop, market and sell a separate Product containing the separately patented Temp-A-Stop Product.

26

81.  Instead of promoting a Temp-A-Stop Product, Cummins marketed and sold (and continues to market and sell) a product which directly competes with Temp-A-Stop (to the exclusion of Temp-A-Stop), notwithstanding Cummins's contractual obligations to make "all reasonable efforts" to market and sell Temp-A-Stop. That product is idle shutdown. (Putterill Deposition Transcript, pg. 197).

82.  Cummins's customers are not ever given a choice between Temp-A-Stop and Cummins's competing products because Cummins never developed or offered for sale a Temp-A-Stop Products. (Exhibit A, ¶37).

<u>Cummins's Bad Faith Efforts to Circumvent its Contractual Obligations to TAS</u>

83.  Unbeknownst to TAS, after entering into the License Agreement with TAS which obligates Cummins to make all reasonable efforts to market and sell Products containing the TAS Technology (*see* Exhibit B hereto), Cummins attempted to circumvent the patents held by TAS related to the TAS Technology (the TAS Patents). A Memorandum, dated September 3, 1997, produced by Cummins in discovery, documents these unconscionable efforts and provides insight into how Cummins treated TAS from the very first year of the two companies' contractual relationship. (Exhibit 88, attached hereto). That Memorandum states, in pertinent part, as follows:

> If you thought things were over guess again. New legal info has revealed that there are work arounds in the TAS patent that will allow us to independently develop and even patent the IIMS system if we can make a few changes to the control scheme.

(Exhibit 88).

84.  Unbeknownst to TAS, Cummins's efforts to engineer around the TAS Patents and circumvent Cummins's contractual obligations to TAS continued. The "JM Option" was an

additional option considered by Cummins to engineer around the TAS Patents. (Exhibit 79, attached hereto).

The TAS Technology is not Obsolete

85.     Jeff Jones testified that there was a current market for the TAS Technology. (Jones Deposition Transcript, pgs. 75 through 77, pgs. 132 through 136, pg. 198).

86.     There is a current strong market demand for the TAS Technology, as evidenced by the fact that Detroit Diesel continues to sell substantial volumes of the Product, and fleet customers such as Swift and U.S. Truck, and truck manufacturers such as Volvo, have recently placed orders for and/or shown substantial interest in the technology. That market demand has been acknowledged by Cummins employees, including Mr. Jones (Jones Deposition Transcript, pgs. 75 through 77, pgs. 132 through 136, pg. 198) and Mr. East (East Deposition Transcript, page 121). (*See also* Exhibit 37).

Failure to Maximize Sales to the Bus and "Engine Ready" Markets

87.     The President of TAS urged Cummins to market the TAS Technology to the bus and "engine ready" market; because he was aware of specific demand in these areas. (Exhibit A, ¶38).

88.     Cummins failed and refused to make even minimal efforts to market to these uses. (Exhibit A, ¶39).

89.     With respect to "engine ready" opportunities, Mr. East testified as follows:

> Q. [by Mr. Riffle]  And "Engine-Ready Opportunities," is the next bullet point, and I think you already made reference to that. Can you give me your understanding of what that means?
>
> A.  Engine ready is a different use of the ICON system, it has nothing to do with cab comfort. It's simply to keep an engine warm during the night, typically during the night, in cold weather. An example might be school buses that need to start and run very

28

early in the morning in a cold weather climate might use
something like an engine-ready system to periodically start and
stop the engine to keep it warm so it doesn't get so cold that it
refuses to start.

Q. Do you have an understanding as to whether or not that type of
system would use some of the TAS Technology?

A. Yes.

Q. And did Cummins ever make any efforts to develop that part of
the market?

A. No, we really did not.

(East Deposition Transcript, pg. 117 line 14 through pg. 118 line 9).

90.     Again respect to the engine ready market, Mr. East testified as follows:

Q. [by Mr. Riffle]  The last bullet point on page C13099 is "Engine
Ready Market is an opportunity of unknown magnitude."  Now, in
connection with the October 2001 presentation, we discussed that a
bit.  Fair to say that as of December, 2001, it still - - the market
opportunity was still at an unknown magnitude?

A. Yes.

Q. Do you know approximately when the determination was made
by Cummins that that wasn't a significant opportunity?

A. No, I do not know.  And I would characterize it this is not a
decision that it is – there was never a decision that it is – there was
never a decision that it was not an opportunity as lack of evidence
to drive us to a decision that it was an opportunity.  So in terms of
looking at the market and understanding the market, we never saw
enough evidence there that would lead us to a decision that this
was an opportunity that we should aggressively pursue.

Q. Did Cummins devote any specific resources to determining
whether there was a market out there for engine ready?

A. I do not know.  I did not personally devote resources.

(East Deposition Transcript, pg. 136 line 9 through pg. 137 line 8).

91.     Mr. Jones testified as follows in regard to the engine-ready market:

Q. [by Mr. Riffle]  Have you ever perceived a significant market for engine-ready application of ICON?

A.  I personally at one time just thought that there might be a decent market for it, but I never really looked at volumes.  It made sense to me from my perspective in some markets, yes. Personally, yes, I had – I had – I thought at one time there might be a decent market for that.

Q.  Did Cummins ever do any market analysis as to that potential market?

A.  I don't really remember.  There was a lot – there was some conversations, but probably not a lot of market analysis done there.

(Jones Deposition Transcript, pg. 148 line 18 through pg. 149 line 4).

92.     Mr. Jones additionally testified at great length concerning the bus market.  (Jones Deposition Transcript, pgs. 151-152).

Continuing Marketing Failures and Failure to Adopt TAS Technology

93.     With respect to marketing literature, Mr. East testified as follows:

Q. [by Mr. Riffle]  During the time period that you were directly responsible for the ICON Product, did the marketing department develop any new literature?

A.  I'm not aware that we developed new literature.  We may have freshened existing literature.   And certainly we would have provided that literature either existing or new to our customers and to our sales force.

Q.  Are you aware of any significant efforts made to update the literature relating to ICON during the time that you were directly involved?

MS. HOLZHALL:  Object to the form.

A.  I'm not.  We can take a look at the literature right here and see what the date is on the back.  Year 2000, so this was last updated in the year 2000.

Q. [by Mr. Riffle]  And that's still the product that's available?

> A.  Literature.  Yeah, I believe so.  So in terms of the ICON brochure, 2000 is what it says on the back, and usually that date would have been the last date that it was updated.

(East Deposition Transcript, pg. 82 lines 6 through 25).

94.     Regarding meetings of the marketing department with original equipment manufacturers, Mr. East testified as follows:

> Q. [by Mr. Riffle]  Did you ever personally meet with any of the OEMs with respect to the ICON product?
>
> A.  I did not, no.
>
> Q.  Did anyone under your direct control ever do so?
>
> A.  I believe my product manager likely would have done that, but I don't know for certain.
>
> Q.  Did he ever report to you with respect to any such meetings?
>
> A.  I don't recall.

(East Deposition Transcript, pg. 83 lines 1 through 9).

95.     An internal memorandum within Cummins, drafted in October, 2001, demonstrates an acknowledgment by Cummins that the ICON Product had not been "fully adopted" by Cummins, and had not been aggressively sold.  (Exhibit 68, attached hereto).  It states, in pertinent part, as follows:

> I think we are rapidly coming to a decision point whereby we either fully adopt ICON and start aggressively selling it, or we lose the license.  Jeff and I feel strongly that a market exists, that value is created/added with ICON and that we should be able to make it a go.

(Exhibit 68).

## III.   APPLICABLE LAW

### A.   Substantive Law

Illinois substantive law controls this case.

### B.   Procedural Law

Federal procedural law governs in this case.  Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Federal Rules of Civil Procedure Rule 56(c). Therefore, the moving party is required to demonstrate that there is no dispute as to <u>any</u> material fact, and must demonstrate that it is entitled to judgment as a matter of law.

To withstand a motion for summary judgment, the non-moving party is merely required to "make a showing sufficient to establish the <u>existence</u> of [the] element[s] essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed. 265 (1986) (emphasis added).  In determining whether factual issues exist, the court should view all the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party.  <u>Wolf v. Buss</u>, 77 F.3d 914, 918 (7th Cir. 1996).

## IV.   ARGUMENT

### A.   TAS Can and Will Prove its Breach of Contract Claim.

#### 1.   TAS can and will establish that Cummins breached the License Agreement.

Prior to entering into the License Agreement (on February 22, 1997), Cummins represented to TAS and projected that it would sell at least 10,000 Products containing the TAS

32

Technology on an annual basis, eventually building up to sales of 12,000 Products per year. (Exhibit A, ¶¶7 & 21). Cummins further represented that its sales volume would be equivalent to DDC's. (Id.) TAS reasonably relied upon Cummins's statements and representations, and fully and reasonably believed that Cummins would sell at least 10,000 Products per year. Cummins's actual performance resulted in sales of fewer than 200 Products per year, which amounts to less than 2% of Cummins's sales projections. The projections and representations were material statements made by Cummins to TAS, in order to induce TAS to enter into the License Agreement. TAS felt comfortable with Cummins's representations, as discussed above, and was induced by those representations to enter into the License Agreement. Most importantly, the representations made by Cummins were backed up by the fact that Cummins contractually agreed to make "all reasonable efforts" to "market and sell ... Products ... so as to maximize the payment of royalties to Licensor ...." Coming from a company the size of Cummins, which at the time of execution of the License Agreement had a share of approximately 30% of the United State heavy duty truck engine market (Exhibit 38; Jones Deposition Transcript, pg. 167), a promise to make "all reasonable efforts" provided substantial comfort and incentive to TAS, and TAS had a reasonable belief that Cummins would live up to its promises and obligations. As discussed below, Cummins fell far short of this standard.

The insertion of the word "all" in front of the term "reasonable efforts" is very important, as it evidences the parties' intent to have a heightened obligation, even beyond the "reasonable efforts" criteria discussed in the applicable Illinois case law. It is an ages-old, fundamental tenet of Illinois law that each and every word in a contract must be given effect:

> One of the rules for interpretation of written contracts is, that the words are to be understood in their plain and literal meaning, although the consequences may not have been in the contemplation of the parties. Anson on Contracts, 2d Am. Ed. 330. Another that--

33

> "every clause and even every word should, when possible, have
> assigned to it some meaning. It is not allowable to presume, or to
> concede when avoidable, that the parties in a solemn transaction
> have employed language idly." Bishop on Contracts, Sec. 384.

Delamater v. Kearns, 35 Ill.App. 634, 1890 WL 2021, *1 (1 Dist. 1890). A modern Illinois

Court more concisely explained this rule, as follows:

> Meaning and effect must be given to every part of the contract
> since it is presumed that each provision was inserted deliberately
> and for a purpose. (White v. White (1st Dist. 1978), 62 Ill.App.3d
> 375, 378, 19 Ill.Dec. 380, 378 N.E.2d 1255.)

Kokinis v. Kotrich, 74 Ill.App.3d 224, 230, 392 N.E.2d 697, 701-02, 30 Ill.Dec. 42, 46-47 (1

Dist. 1979), *affirmed*, 81 Ill.2d 151, 407 N.E.2d 43, 40 Ill.Dec. 812 (1980). As for the phrase

"all reasonable efforts", one Court explained the meaning of "all reasonable efforts" as follows:

> "Even if the efforts [the alleged contemnor] did make were
> 'substantial,' 'diligent' or 'in good faith,' ... the fact that he did not
> make 'all reasonable efforts' establishes that he did not sufficiently
> rebut the ... prima facie showing of contempt." *United States v.*
> *Hayes,* 722 F.2d 723, 725 (11th Cir.1984).

S.E.C. v. Custable, 1999 WL 92260, *3 (N.D.Ill. 1999).

The deposition testimony of Cummins's employees (as set forth in detail in the Statement

of Additional Material Facts (the Statement)) reveals that Cummins actually made very little

meaningful effort to market and sell Products utilizing the TAS Technology. Other than the

"initial launch" of the Retrofit Product in 1999, Cummins never had a marketing plan, and never

made any real concerted effort to market the Products. While Cummins went to great lengths

during the depositions to maintain that marketing efforts were ongoing, when pressed on this

point, Cummins's employees revealed that their marketing efforts (at least from July, 2001

onward) merely consisted of making literature (which was never even updated since 2000)

available. (East Deposition Transcript and Jones Deposition Transcript, quoted at length in the Statement, above).

Cummins repeatedly changed the personnel assigned to develop and market Products utilizing TAS Technology, and the personnel so assigned were given insufficient resources and direction to bring the Products to market on a significant commercial scale. Cummins assigned an untested, part-time employee to spearhead the ICON marketing plan. (*See* Statement, above, ¶25). During six to eight months of 2001, the Product manager within the Cummins marketing department who was responsible for ICON spent only three (3) to five (5) percent of his time on ICON. (*See* Statement, above, ¶63). Similarly, the personnel assignments for engineering and development were also frequently changed, and development of Products utilizing the TAS Technology was given a very low priority within Cummins, in breach of Cummins's obligations under the License Agreement's "all reasonable efforts" clause. Evidence in this regard includes the memo from Mr. Steele to Mr. Putterill, wherein he references the fact that his workload has been re-prioritized, and he has been instructed to discontinue work on ICON in favor of other "higher priority work." (*See* Statement, above, ¶69).

Not surprisingly, sales of products containing the TAS Technology in 2001 were negligible; by that time, Cummins had clearly abandoned any meaningful effort to market the product. (*See* Statement, above, ¶39). In January and February of 2001, absolutely no Products were sold. (Id.) In March, 2001, Cummins "ramped up" to a grand total of 2 retrofit product sales (and still no ECM sales). (Id.) By 2002, the Products were considered by the project manager to be "all but dead." (*See* Statement, above, ¶¶60, 65 & 67). However, while Cummins considered the ICON Product to be "all but dead," DDC continued to market and sell its nearly

identical product at the approximate rate of 15,000 per year. (*See* Statement, above, ¶¶23 & 24).

The customer demand was there, but the marketing efforts by Cummins was not.

In the case of Roboserve, Inc. v. Kato Kagaku Co., Ltd., the Seventh Circuit Court of

Appeals summarized the law in Illinois as to "reasonable efforts" clauses in contracts:

> "Reasonable efforts" clauses are enforceable in Illinois. The
> question of what is "reasonable" under a contract is an issue of fact
> for the trier of fact. *See Honkomp v. Dixon,* 97 Ill.App.3d 476, 52
> Ill.Dec. 740, 742, 422 N.E.2d 949, 951 (1981) ("Questions of
> reasonableness and good faith are generally issues of fact,
> entrusted for resolution to the trier of fact.").

78 F.3d 266, 278 (7th Cir. 1996), *rehearing and suggestion for rehearing en banc denied* (1996),

*cert. denied*, 519 U.S. 928, 117 S.Ct. 297, 136 L.Ed.2d 215 (1996) (emphasis added). Roboserve

concerned a contract between the owner of the Hyatt Regency Chicago hotel, "Kato", and

Roboserve, Inc., a designer and manufacturer of hotel "minibars" (or "Robobars"). The contract

between the parties required that Kato "use 'reasonable endeavors' to place those guests most

likely to use minibars in the Robobar rooms and to encourage them to make purchases from the

minibars." 78 F.3d at 271. The Seventh Circuit upheld the jury's finding that Kato breached its

duty to Roboserve under the "reasonable endeavors" clause in the parties' contract, stating as

follows:

> The evidence demonstrates that Kato could have placed Robobars
> in the more upscale Gold Passport rooms, but it did not. Kato also
> could have informed its guests of the Robobars and given them
> brief instructions as to their use, but it did not. At the very least,
> Kato could have refrained from establishing and promoting a
> competing product line within the HRC itself, but it did not. By
> agreeing to this provision, Kato was committed to a number of
> "endeavors" that it did not perform but that Roboserve (and the
> jury) could have considered reasonable. Whatever the precise
> affirmative duties of one bound to use "reasonable endeavors" to
> promote a product, the jury could reasonably have found that Kato
> had not complied.

78 F.3d at 278 (emphasis added).

In this case, as in <u>Roboserve</u>, there are <u>many</u> efforts which Cummins did not perform which TAS (and the jury) could consider to have been reasonable. Those efforts which TAS believes should have been made include, but are not limited to, the following:

1.      Development of a separate Temp-A-Stop Product (as discussed in detail in TAS's Motion for Summary Judgment). (Statement, above, ¶¶80 through 82). (In the words of the Court in <u>Roboserve</u>, Cummins could have at least refrained from promoting its idle product which competes with the Temp-A-Stop Product) (<u>Id.</u>)

2.      Additional marketing efforts, beyond the initial launch in 1999, of the Temp-A-Start Technology, (other than simply having outdated literature available). (Statement, above, ¶¶42-43, 52 through 54, & 93).

3.      Staffing of the marketing of the TAS Technology with individuals who were more experienced and knowledgeable regarding the product, and having these individuals devote a higher percentage of their time to the ICON Product. (Statement, above, ¶¶25 & 63).

4.      Highlighting the TAS Technology at trade shows in years subsequent to 1999. (Statement, above, ¶42).

5.      Promoting the TAS Technology in trade journals. (Statement, above, ¶53).

6.      Taking steps to ensure that the TAS Technology could be included in the new ECM developed in 2002. (Statement, above, ¶¶44 through 51).

7.      Taking steps to develop the EM100 in light of the fact that sufficient foresight was not applied to enable the TAS technology to be included in the new ECM. (Statement, above, ¶¶47 through 49).

8.     Honoring Freightliner's request for the development of an LED display (at an approximate cost of $10,000) to induce Freightliner to adopt the TAS Technology.  (Statement, above, ¶¶73 through 76).

9.     Devoting additional resources to bring the ECM Product to market earlier. (Statement, above, ¶¶35 through 37).

10.    Devoting additional resources to bring the Retrofit Product to market earlier. (Statement, above, ¶¶33-34, & 38).

11.    Making at least some effort to market and sell to the "engine ready" and bus markets.  (Statement, above, ¶¶87 through 92).

12.    Refraining from developing the generator product in competition with Temp-A-Start.  (Statement, above, ¶¶77 through 79).

13.    Refraining from attempting to engineer around the TAS Patents.  (Statement, above, ¶¶83-84).

14.    Updating or re-issuing marketing materials, instead of using materials dating back to an earlier version of the product which were generated in 2000.  (Statement, above, ¶¶52 through 54, & 93).

All of these efforts would have been reasonable, and would have resulted in substantial additional sales.  If Cummins had made significant additional efforts, it would have sold more products.  Cummins sold less than two (2) percent of what it had projected.  If it had sold just 20% of what it had projected, (i.e., 2000 to 2400 units per year) it would have exceeded the $1,000,000 minimum in royalties, and would have owed additional royalties to TAS.  (*See* Statement, above, ¶27; *see* Exhibit B hereto).

38

Cummins cites only two cases in support of its argument that the "reasonable efforts" clause in the License Agreement is unenforceable: Roboserve, *supra*, which actually supports TAS's position, and M.S. Distributing Co. v. Web Records, Inc., 2003 WL 21087961 (N.D.Ill. 2003), an unpublished, non-precedential order which was based entirely upon the unique facts of the case. Moreover, the M.S. Distributing Co. case concerned a new product, and is distinguishable on this ground from this case.

In this case, there was an actual, provable understanding between the parties regarding the approximate number of Products which were expected to be sold. Clearly, Cummins has breached a material term of the License Agreement (i.e., the "all reasonable efforts clause"). Without that provision, TAS would never have contracted with Cummins. The breach is of sufficient gravity to constitute an actionable breach of the License Agreement under Illinois law:

> It is well-settled that only a material breach will justify the non-breaching party's failure to perform its contractual duties. *Arrow Master, Inc. v. Unique Forming Ltd.,* 12 F.3d 709, 714 (7th Cir.1993). * * *. The *Arrow Master* court considered a breach to be "material" when "the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it." *Id.* at 715 (quoting *Haisma v. Edgar,* 218 Ill.App.3d 78, 161 Ill.Dec. 36, 578 N.E.2d 163 (1991)).

Intervisual Communications, Inc. v. Volkert, 975 F.Supp. 1092, 1100 (N.D.Ill. 1997) (emphasis added). It is respectfully submitted that had TAS known at the time of contract execution that its technology would have been treated with such disdain, that Cummins would continue to try to engineer around the TAS Patents even after contract execution, that Cummins would develop competing products, and that the marketing of the TAS based product would have been assigned to a part-time employee who did not even understand what the TAS Technology was, TAS would have never executed the License Agreement.

39

**2.    Cummins's arguments as to the Damages element of TAS's Breach of Contract Counts Fail.**

First, Cummins's allegation that TAS is required to "show ... that [TAS] has suffered

damages because of [Cummins]'s breach" is simply incorrect (although TAS is confident that it

will, indeed, be able to establish and prove with reasonable certainty the existence and amount of

damages).  Second, Cummins misapplies the "new product" rule in Illinois, which is clearly

inapplicable in this case.  TAS can establish its damages in this case with a reasonable degree of

certainty, and can establish a reasonable basis for its calculation of those damages, as is required

under Illinois law.

        a.    TAS need only establish breach of the License Agreement, rather than damages, in order to survive Cummins's Motion for Summary Judgment.

In order to maintain a claim for breach of contract, TAS need only establish the breach,

and need not establish damages:

> ... failure of proof of damages does not justify the dismissal of a
> claim for breach of contract, as it does most tort claims. The victim
> of a breach of contract is always entitled to nominal damages if he
> proves a breach but no damages. *Vasselos v. Greek Orthodox
> Community,* 24 Wis.2d 376, 129 N.W.2d 243 (1964); Farnsworth,
> Contracts 838-39 (1982); Dobbs, Remedies 817-18 (1973).

Olympia Hotels Corp. v. Johnson Wax Development Corp., 908 F.2d 1363, 1372 (7th Cir. 1990)

(emphasis added); *see also* Zenith Electronics Corp. v. WH-TV Broadcasting Corp., 2003 WL

22284326, *4 (N.D.Ill. 2003).

> Liability in a contract case ..., does not depend on proof of injury.
> Proof of liability is complete when the breach of contract is shown.
> *Stromberger v. 3M Co., supra,* 990 F.2d 974, 976. At that point the
> plaintiff is entitled to nominal damages, even if he cannot show
> any injury from the breach. *Id.* at 976; *Chronister Oil Co. v.
> Unocal Refining & Marketing,* 34 F.3d 462, 466 (7th Cir.1994); 3
> E. Allan Farnsworth, *Farnsworth on Contracts* § 12.8, p. 185

40

> (1990). So the fact as well as the amount of injury can readily be
> postponed to the second trial.

Hydrite Chemical Co. v. Calumet Lubricants Co., 47 F.3d 887, 891 (7th Cir. 1995). (As the

Court noted in Gonzalzles v. American Exp. Credit Corp., cited by Cummins for the elements of

breach of contract, the prima facie case requires a showing of "resultant injury to the plaintiff",

not a quantification of damages. 315 Ill.App.3d 199, 206, 733 N.E.2d 345, 351, 247 Ill.Dec.

881, 887 (1 Dist. 2000)).

In TAS's own Motion for Partial Summary Judgment, TAS moves for summary

judgment on the issue of liability on the breach of contract Counts, but refrains from requesting

damages because there is potentially a dispute as to the proper calculation of TAS's damages.

TAS has proven that the License Agreement was breached and that it is therefore entitled to

damages, and asserts that there is a remaining issue as to the amount of damages to which TAS is

entitled as a result of Cummins's breach of the License Agreement.

> b. TAS can establish its damages in this case with a reasonable
> degree of certainty, and can establish a reasonable basis for its
> calculation of those damages, as is required under Illinois law.

The "New Product" Rule is clearly inapplicable in this case. Cummins alleges that the

TAS Technology is a "new product", and is therefore subject to the new business bar on lost

profits in Illinois law. In actuality, the TAS Technology has already been tried and tested in the

marketplace, by TAS itself and by DDC. (*See* Statement, above, ¶¶3, 20, 23-24). In the case

cited by Cummins for the "new product" rule, the Court specifically distinguished situations like

the case at hand, where there is a sales history established for the product at issue, stating as

follows:

> The second exception [to the "new product" rule] cited by Kinesoft
> is based on *Milex Products, Inc. v. Alra Laboratories, Inc.,* 237
> Ill.App.3d 177, 191-92, 177 Ill.Dec. 852, 603 N.E.2d 1226 (2d

41

Dist.1992). In that case, the plaintiff, a new business, recovered lost profit damages for a breach of contract to manufacture a new pharmaceutical drug that it had not previously marketed or sold, but which had been sold by its competitors for many years prior to the alleged breach of contract. The court allowed the plaintiff to recover lost profits based on expert analyses estimating the profits made by its competitors prior to the breach. The court found that such estimates were not based on speculation or conjecture because plaintiff's expert testified that the lost profits calculations were based upon actual products sold in the marketplace and pointed to authoritative sources for the data used for those calculations. The Court stated:

> [w]hile the product is a new one, the evidence showed it to have an established market. Given that fact, together with [plaintiff's expert's] testimony, we conclude that the proof of lost profits was neither speculative nor the product of conjecture but was based upon a reasonable degree of certainty.

*Id.* at 193, 177 Ill.Dec. 852, 603 N.E.2d 1226. The problem with Kinesoft's resort to this exception is that in projecting lost profits, Kinesoft's own expert gave no consideration to "any analysis of a comparable company selling comparable games" (Defs.' Facts ¶ 53). Without such a comparison, there is no predicate for applying the *Milex* exception.

Kinesoft Development Corp. v. Softbank Holdings Inc., 139 F.Supp.2d 869, 910 (N.D.Ill. 2001),

*reconsideration denied* (discussing Milex Products, Inc. v. Alra Laboratories, Inc., 237

Ill.App.3d 177, 603 N.E.2d 1226, 177 Ill.Dec. 852 (2 Dist. 1992), *appeal denied*, 149 Ill.2d 651,

612 N.E.2d 515, 183 Ill.Dec. 863 (1993)).

In the recent case of BEM I, L.L.C. v. Anthropologie, Inc., the Seventh Circuit Appellate

Court upheld an arbitration award including lost profits for a store that was prevented from

opening its doors in a new town, stating, in pertinent part, as follows:

> As for lost profits for a new store, the outer limits of that hoary principle are vague, *MindGames, Inc. v. Western Publishing Co.,* 218 F.3d 652, 656, 657 (7th Cir.2000), even in Illinois, see *Milex Products, Inc. v. Alra Laboratories, Inc.,* 237 Ill.App.3d 177, 177 Ill.Dec. 852, 603 N.E.2d 1226, 1236-37 (Ill.App.1992), and, bearing in mind that its purpose is merely to limit the speculative

> element in estimating lost profits, it may be inapplicable to a case
> such as this, in which the new store is an identical copy of the
> other stores in a highly successful chain. *DeJong v. Sioux Center,
> Iowa,* 168 F.3d 1115, 1123 (8th Cir.1999); *No Ka Oi Corp. v.
> National 60 Minute Tune, Inc.,* 71 Wash.App. 844, 863 P.2d 79,
> 82-84 (Wash.App.1993); see also *Eljer Mfg., Inc. v. Kowin
> Development Corp.,* 14 F.3d 1250, 1255-56 (7th Cir.1994).

301 F.3d 548, 555 (7th Cir. 2002) (emphasis added).

This case is even clearer than Milex Products and BEM I. Here, the actual product at

issue has been sold in the marketplace. There is no need to use expert testimony to establish the

likely profits of competitors selling a similar product, as there was in Milex Products. Here,

TAS can prove as fact, rather than opinion, the value of the TAS Technology in the marketplace.

The value in the marketplace is set forth in Section 5 of the License Agreement, wherein

Cummins agreed to specific per-unit royalties. Therefore, the "new product" rule does not apply

in this case. Perhaps more importantly, this is not a "lost profits" case, but rather a case in which

a contractual per-unit royalty was negotiated and agreed upon in advance of anticipated

performance. The volumes were projected by Cummins. Cummins now seeks to avoid the

consequences of its own agreement and its own sales projections by deceptively (and

erroneously) claiming the applicability of the "new product" rule.

When a jury makes an ultimate determination awarding damages for lost profits in

Illinois, the bases for that decision need not be based upon mathematical certainty, but need only

be reasonable:

> In Illinois, "the evidence need only to tend to show a basis for the
> computation of damages with a fair degree of probability."
> *Medcom Holding Company v. Baxter Travenol Laboratories, Inc.,*
> 106 F.3d 1388, 1398 (7th Cir.1997) (quoting *In re Busse,* 124
> Ill.App.3d 433, 79 Ill.Dec. 747, 464 N.E.2d 651, 655 (1st
> Dist.1984)). Moreover, lost profits need not be proven with
> absolute certainty. *Medcom,* 106 F.3d at 1399. Such damages are
> not capable of proof with absolute certainty and thus we merely

> require the evidence to "tend to establish a basis for the assessment
> of damages." *H. Vincent Allen & Associates v. Weis,* 63 Ill.App.3d
> 285, 19 Ill.Dec. 893, 379 N.E.2d 765, 770 (1st Dist.1978).

Jabat, Inc. v. Smith, 201 F.3d 852, 857 (7th Cir. 2000); *see also* Bankcard America, Inc. v.

Universal Bancard Systems, Inc., 203 F.3d 477, 486 (7th Cir. 2000), *cert. denied,* 531 U.S. 877,

121 S.Ct. 186, 148 L.Ed.2d 128 (2000), *rehearing denied,* 531 U.S. 1105, 121 S.Ct. 797, 148

L.Ed.2d 727 (2001) ("... Illinois courts are reluctant to interfere with the discretion of the jury in

its finding of fact regarding damages. *SK Hand Tool Corp. v. Dresser Indus., Inc.,* 672 N.E.2d

341, 348, 284 Ill.App.3d 417, 219 Ill.Dec. 833 (1996)"); *see also* Havoco of America, Ltd. v.

Sumitomo Corp. of America, 971 F.2d 1332, 1345 (7th Cir. 1992), *rehearing denied.*  The

Illinois Supreme Court recently summarized the rationale underlying the foregoing rule, stating

as follows:

> Defendants should not be permitted to escape liability entirely
> because the amount of the damage they have caused is uncertain.
> To do so would be to immunize defendants from the consequences
> of their wrongful conduct. See *Vendo Co. v. Stoner,* 58 Ill.2d 289,
> 310, 321 N.E.2d 1 (1974).

Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc., 199 Ill.2d 325, 361, 770 N.E.2d 177,

199, 264 Ill.Dec. 283, 305 (2002), *rehearing denied.*

Cummins's only support for its bold, if somewhat irrelevant, assertion that "[a]t the

summary judgment stage, a plaintiff cannot simply list or describe categories of damages..."

(Motion, pg. 12), is an unpublished order from the District Court for the Southern District of

New York that conflicts with the case law of the Seventh Circuit Appellate Court, above,

namely, New Paradigm Software Corp. v. New Era of Networks, Inc., 2002 WL 31749396

(S.D.N.Y. 2002) (which, in fact, itself relies almost exclusively on unpublished orders). The fact

of the matter is that TAS has alleged and proffered sufficient facts (and has placed those facts within a sound damages theory) to prove its damages claims before a jury under Illinois law.

The only published opinion cited in Paradigm Software on the issue of proof of damages on summary judgment is Weinstock v. Columbia University, wherein the Second Circuit Appellate Court stated as follows:

> Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. When the motion is made, we go beyond the paper allegations of the pleadings, which were enough to survive the common law demurrer. The time has come, as James and Hazard put it, "to put up or shut up." Fleming James, Jr. & Geoffrey C. Hazard, Jr., *Civil Procedure* 150 (2d ed.1977). Accordingly, unsupported allegations do not create a material issue of fact. *See Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *see also Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991).

224 F.3d 33, 41 (2nd Cir. 2000), *cert. denied,* 124 S.Ct. 53, 157 L.Ed.2d 24 (2003) (emphasis added). In this case, TAS's supported allegations do establish a material issue of fact, regarding the measure and reasonable amount of damages, which should be submitted to a jury for determination pursuant to Illinois law.

TAS has provided a reasonable basis upon which a calculation of damages suffered to date can be based.[5] Cummins represented to TAS that it would sell 10,000 Products on an annual basis, eventually ramping up to 12,000. Cummins even prepared a Powerpoint Presentation showing the gross disparity between its representations and projections (at 10,000 to

---

[5] TAS is not "waiting in the weeds" with respect to its damages claim. TAS has always made clear its belief that Cummins should have sold approximately as many Products as DDC, or at least as many as Cummins had projected and represented to TAS before the contract was executed. It is quite interesting to note that Cummins served Interrogatories in this case, and did not even inquire regarding the damages theories and claims of TAS. If any party was "waiting in the weeds," TAS respectfully submits that it was Cummins.

12,000 units per year) and its actual sales of fewer than 200 Products per year. (*See* Statement, above, ¶32; Exhibit 17 at C013076). DDC sold approximately 15,000 units per year over the period in question. Since the parties have an express written contract calling for specific per unit royalties, the amount of royalties which would have been paid on the basis of either the projections and representations, or the comparison with sales by DDC, can easily be determined with mathematical certainty. To the extent Cummins can convince the jury that extenuating circumstances prevented it from meeting its own projections and representations, this would serve to reduce the amount of damages. (Similarly, if Cummins can prove to a jury that even though it sold less than 2% of the number of Products that it represented and projected, it still fulfilled its "all reasonable efforts" obligations, that would be a defense to that aspect of the breach of contract claims raised by TAS).

TAS, in this Response, in its Complaint and in its own Motion for Partial Summary Judgment, has more than adequately established that it has been damaged by Cummins; breach of the License Agreement, and that there is a material issue of fact as to the amount of the damage caused by Cummins (though the existence of such damage is not open for debate, as discussed above). It certainly cannot be said that Cummins's right to judgment on this issue is clearcut a matter of law.

### B.    Declaratory Judgment.

In Counts II, IV, VI and VIII of its Complaint, TAS asks that the Court invoke its powers under the Declaratory Judgment Act, 28 U.S.C. §2201 *et seq.*, to determine the rights and obligations of the parties under the License Agreement. The Declaratory Judgment Act states, in pertinent part, as follows:

> In a case of actual controversy within its jurisdiction, ... , any court
> of the United States, upon the filing of an appropriate pleading,

46

> may declare the rights and other legal relations of any interested
> party seeking such declaration, whether or not further relief is or
> could be sought.

28 U.S.C. §2201(a) (emphasis added). Cummins objects to this Court's use of its declaratory

judgment powers on the grounds that "TAS is asking for a declaration that would clarify

Cummins' duties...." Motion, pg. 19. Cummins has turned TAS's requests around; TAS is

asking that the Court determine the proper interpretation of the License Agreement's terms, and

determine TAS's rights under the License Agreement as an interested party.

The Courts have explained the proper usage of declaratory judgment:

> ... the Declaratory Judgment Act should be construed to effectuate
> the purpose of the Act, which is "to afford relief from uncertainty
> and insecurity with respect to legal relations." *Imperial Cas. and*
> *Indem. Co. v. Chicago Hous. Auth.,* 759 F.Supp. 446, 448
> (N.D.Ill.1991) (quoting *Sears, Roebuck and Co. v. American Mut.*
> *Liab. Ins. Co.,* 372 F.2d 435, 438 (7th Cir.1967)).

Intervisual Communications, Inc. v. Volkert, 975 F.Supp. 1092, 1099 (N.D.Ill. 1997) (cited by

Cummins). As the Seventh Circuit Appellate Court recently stated:

> ... if the declaratory judgment will clarify and settle the disputed
> legal relationships and afford relief from the uncertainty and
> controversy that created the issues, it is usually resolved rather
> than dismissed.

NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V., 28 F.3d 572, 578 (7th Cir.

1994) (quoted in Intervisual Communications, 975 F.Supp. at 1099).

Here, Cummins has made several claims and taken several positions which make this

case appropriate for declaratory relief, including the "New Product" claim raised in Cummins'

Motion for Summary Judgment, Cummins' claim (addressed in TAS' Motion for Summary

Judgment) that Cummins has no future obligations to pay royalties, and the issues surrounding

the separate Temp-A-Stop Product.

47

In order to support its position that declaratory relief is not appropriate in this case,

Cummins relies exclusively on the following three unpublished cases from the District Court for

the Northern District of Illinois:  Asch v. Teller, Levit & Silvertrust, P.C., 2003 WL 22232801

(N.D.Ill. 2003), International Paper Co. v. Androscoggin Energy LLC, 2003 WL 21468623

(N.D.Ill. 2003), and Household Financial Services, Inc. v. Northern Trade Mortg. Corp., 1999

WL 782072 (N.D.Ill. 1999).  These cases are of no precedential value whatsoever, yet Cummins

cites to the unpublished opinions without comment, and in seeming reliance thereon.  In any

case, the reasoning in these cases is incorrect insofar as it would bar declaratory relief in this

case, and should be disregarded on this ground as well.

Counts II, IV, VI and VIII of TAS's Complaint do state a justiciable controversy.  TAS

seeks a declaration as to its rights under the License Agreement.  Therefore, Cummins's Motion

for Summary Judgment as to Counts II, IV, VI and VIII should be denied.

## C.  An Order for Specific Performance of the Reasonable Efforts Clause is Appropriate in this Case.

Specific performance is an appropriate remedy where a party breaches a valid and

enforceable contract, and remedies at law are inadequate.  The "reasonable efforts" clause in the

License Agreement is valid and enforceable, as discussed above.  Because the "reasonable

efforts" clause is itself an enforceable term of the License Agreement, the clause can be

effectuated through an Order requiring that Cummins specifically perform its obligations under

the "reasonable efforts" clause, on a going forward basis.  Because the License Agreement is

essentially unlimited as to time (ending only if and when the TAS Technology becomes

obsolete), the damages caused by Cummins's breach in the future (if, indeed, Cummins were to

continue to breach its "all reasonable efforts" obligations) are not currently ascertainable and

monetary damages at this point in time would be inadequate.  Moreover, given the recent "flurry

48

of activity" brought about by specific demand from customers such as Swift and U.S. Truck,

there is some possibility that Cummins will begin to sell a significant amount of products

containing the TAS Technology (not through its diligent efforts, but rather at the insistence of its

customers). (*See* Statement, above, ¶¶66-67). The number of products Cummins will sell in the

future, and the extent of its compliance with and/or future breach of the "all reasonable efforts"

clause, cannot be predicted at this point in time.

The Seventh Circuit Court of Appeals has summarized the standard used in granting

specific performance, stating, in pertinent part, as follows:

> The normal remedy for breach of contract is an award of damages.
> Specific performance is exceptional, for reason unnecessary to get
> into here. See *Walgreen Co. v. Sara Creek Property Co.,* 966 F.2d
> 273 (7th Cir.1992); *Great Central Ins. Co. v. Insurance Services
> Office, Inc.,* 74 F.3d 778, 784 (7th Cir.1996). The exception comes
> into play when damages are an inadequate remedy, whether
> because of the defendant's lack of solvency or because of the
> difficulty of quantifying the injury to the victim of the breach.
> * * *, See, e.g., *Medcom Holding Co. v. Baxter Travenol
> Laboratories, Inc.,* 984 F.2d 223, 227 (7th Cir.1993).

Miller v. LeSea Broadcasting, Inc., 87 F.3d 224, 230 (7th Cir. 1996); *see also* Cummins's

Motion for Summary Judgment, pg. 13, citing Zic v. Italian Government Travel Office, 130

F.Supp.2d 991 (N.D.Ill. 2001), for the proposition that a "grant of specific performance requires

some element to show that relief at law would be inadequate, such as uncertainty or inadequacy

of money damages".

Here, damages for current breaches of the "all reasonable efforts clause" and the other

breach are reasonably ascertainable, whereas damages for future breaches of the ongoing

obligations are not currently susceptible to calculation. Accordingly, grants of specific

performance are appropriate.

## V.  CONCLUSION

For all the foregoing reasons, Cummins's Motion for Summary Judgment should be

denied.

WHEREFORE, TAS respectfully requests that this honorable Court deny Cummins's

Motion for Summary Judgment.

Respectfully submitted,

TAS DISTRIBUTING COMPANY, INC.,
Plaintiff

By: _Robert M. Riffle_

One of Its Attorneys

John S. Elias
Robert M. Riffle
Janaki Nair
Elias, Meginnes, Riffle & Seghetti, P.C.
416 Main Street
Peoria, IL 61602
(309) 637-6000

904-0572

## CERTIFICATE OF SERVICE

The undersigned certifies that on May 11, 2004, a copy of the foregoing document was served upon each party to this case by

    Via Federal Express - Express Package Service - Priority Overnight

Phillip M. Goldberg
Marianne C. Holzhall
Foley & Lardner
321 North Clark Street
Chicago, IL 60610

    Personal delivery to the attorney of record of each party at the address(es) listed below

David G. Lubben
Davis & Campbell, L.L.C.
401 Main Street, Suite 1600
Peoria, IL 61602


Robert M. Riffle


John S. Elias
Robert M. Riffle
Janaki Nair
Elias, Meginnes, Riffle & Seghetti, P.C.
416 Main Street
Peoria, IL 61602
(309) 637-6000

51

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## CENTRAL DISTRICT OF ILLINOIS LOCAL RULE 7.1 (B) (2)

Pursuant to Local Rule 7.1 (B) (2) of the Rules of the United States District Court,

Central District of Illinois, the undersigned hereby certifies that an analysis of the foregoing

Response using the document information program of Microsoft Word yields the following

results:

|  |  |
|---|---|
| Words: | 6,841 |
| Characters: | 35,608 |
| Lines: | 622 |

The Memorandum is therefore in compliance with the volume type limitation of

Local Rule 7.1 (B) (2).

_____
Robert M. Riffle
Attorney for the Plaintiff